Argued and submitted February 5, reversed and remanded for entry of order May 9, petition for review denied August 7, 2001 (332 Or 430)

In the Matter of
J. S. F., a Minor Child.

STATE ex rel STATE OFFICE FOR
SERVICES TO CHILDREN AND FAMILIES,
*Appellant,*

*v.*

David FREEMAN,
*Respondent.*

992978J1; A112169 (Control)

In the Matter of
J. C. F., a Minor Child.

STATE ex rel STATE OFFICE FOR
SERVICES TO CHILDREN AND FAMILIES,
*Appellant,*

*v.*

David FREEMAN,
*Respondent.*

992978J2; A112170

In the Matter of
J. D. F., a Minor Child.

STATE ex rel STATE OFFICE FOR
SERVICES TO CHILDREN AND FAMILIES,
*Appellant,*

*v.*

David FREEMAN,
*Respondent.*

992978J3; A112171
(Cases Consolidated)

23 P3d 1009

Denise G. Fjordbeck, Assistant Attorney General, argued the cause for appellant. With her on the brief were Hardy Myers, Attorney General, and Michael D. Reynolds, Solicitor General.

D. Olcott Thompson argued the cause and filed the brief for respondent.

Before Landau, Presiding Judge, and Linder and Brewer, Judges.

LINDER, J.

## LINDER, J.

The state appeals from an order denying the petition of the State Office for Services to Children and Families (SCF) for termination of parental rights. We reverse and remand for entry of an order terminating father's parental rights.

We review *de novo*, ORS 419A.200(5), giving considerable weight to the trial court's findings of fact insofar as they reflect credibility assessments. *State ex rel Juv. Dept. v. Boren*, 105 Or App 599, 601, 806 P2d 149 (1991). At the time father and mother began a sexual relationship in 1992, father was 19 and mother was 14. They both were living in Idaho. Their first son, child one,[1] was born in 1995, and two more sons, child two and child three, were born in 1996 and 1998, respectively. Both parents have a long history of alcohol and methamphetamine use. Before the births of the children, father was arrested multiple times for DUII, battery, vandalism, and resisting arrest. He spent time in and out of jail, on work release, and in treatment programs. According to mother, throughout their relationship, when father was drunk or on drugs, he beat her on numerous occasions, including a 40-minute beating that child one, after crying and screaming, just "sat and watched." Since the children's births, father has been arrested and jailed several times for probation violations. After he was released, he was arrested again and jailed for battery (arising from an incident that the children witnessed). In 1998, as a result of repeated probation violations, including testing positive for methamphetamine, father was convicted and sentenced to an Idaho state prison. He admitted using alcohol and methamphetamine again a few months after being paroled in March 2000, despite his participation in a treatment program.

During father's most recent prison term, mother visited and corresponded with him a few times, but their communication lapsed. In May 1999, mother, her new boyfriend, and the children left Idaho and came to Oregon. She did not tell father that they were leaving or where they were going

---

[1] We refer to the children as child one, child two, and child three, in order of age.

because, as she testified, she was afraid of him. Mother, her boyfriend, and the children ended up living in a homeless shelter in Lincoln City.

In June 1999, daycare workers in Lincoln City notified SCF about their concern that the children were suffering from neglect and injuries. On each of their few visits to the center, all three boys showed up unclean, in dirty clothes, and wearing no underwear. Child three arrived at the center on more than one occasion severely sunburned, resulting in welts and blisters, and displayed bruises and a puncture wound on his heel. After some difficulty, SCF located mother, who could not explain the injuries, other than to claim that child one was rough with the younger boys and that her boyfriend was aggressive and used physical discipline. As a result of that incident, the children were removed from mother's custody and placed in nonrelative foster care.

SCF attempted without success to provide services to mother. Although mother participated in some services, she also missed visitation appointments, admitting to being "down on the bay front drinking alcohol." Mother's urinalysis results suggested active substance abuse. The boys' foster parent reported "extreme behavior problems" after they returned from an unsupervised weekend visit with mother. SCF lost contact with mother in August 1999. Father first learned that the children were in Oregon when SCF contacted him in prison that same month; he had not attempted to locate mother or the children after losing touch with mother. At SCF's request, he wrote a letter to the judge who was handling the children's case, describing mother's substance abuse and deficiencies as a parent. In that letter, father blamed mother for the children's situation. Mother finally contacted SCF again in November. After conducting evaluations of the children, SCF determined that adoption was in the children's best interests and revised its plan for the children from reunification to adoption. Consequently, SCF later filed petitions to terminate both mother's and father's parental rights on the grounds of parental unfitness and neglect.[2]

_____

[2] Although mother stipulated at trial that her parental rights should be terminated if father's parental rights were terminated, only the order regarding

In July 2000, two weeks before the termination trial, father came to Oregon to undergo a psychological evaluation for use in the trial and to visit the children for the first time since mother left Idaho. The psychological evaluation of father included a diagnosis of amphetamine use with intermittent explosive disorder and a probable antisocial personality disorder. The psychologist found it significant that father "basically doesn't take responsibility for anything" and that he blames others, particularly mother, for his present problems. Father also denied that the children had any significant emotional problems. In the psychologist's opinion, father would need at least two years to work on his parenting deficiencies to reach an acceptable standard to provide for the children's needs. Maintaining sobriety would be essential to achieving that standard, but the psychologist doubted father's ability to do so, especially in light of father's admitted recent use of alcohol and methamphetamine in the shadow of a pending termination trial when he knew he was under scrutiny. The psychologist testified that she did not believe father could remedy the personality disorder and that he could not parent the children on his own.

The evidence at trial revealed that the needs of the children are significant, with child one demonstrating the highest level of special need. Several professionals evaluated the boys, including a psychologist for the older two and a team of early intervention specialists for all three. Child one, who was four-and-one-half years old at the time of the psychological evaluation, suffers from emotional and psychological problems. In foster care, he displayed extremely aggressive behavior toward his foster parents and other children, requiring constant monitoring. He cursed, threw rocks, and ran from adults. Child one spoke frequently about marijuana and beer, at one point asking the foster parents, "What? Where's my f—kin' beer[?]," when they gave him a soda. Child one began to see a counselor regularly to learn to manage his anger, which likely stemmed from his early environment. Although his behavior improved, he could not be trusted to be alone with other children without hurting them.

father's parental rights is before us on appeal. The trial court apparently has stayed resolution of the petition to terminate mother's rights pending the outcome of this appeal.

The psychologist, who diagnosed child one with Adjustment Disorder with Mixed Disturbance of Emotion and Conduct, testified that child one needs a role model who does not have his or her own anger-related behavior problems. When he was given intelligence tests, child one scored below average and demonstrated below-average self-sufficiency skills. Child one qualified for early intervention services related to his communication deficiencies and attended an early intervention preschool where he received social skills training and direct instruction in communication. On the advice of a learning specialist, SCF planned to enroll child one in public kindergarten, with extra support and supervision and an individually designed special education program.

Child two, who was about three years old at the time of the evaluation, seemed shy and appeared to have difficulty communicating with other children and expressing his needs. He was often fearful, flinching, or cowering when someone approached him, and would drop his toys rather than defend them. Child two's foster parent reported that he would "freak out" when he soiled his diaper. The psychologist diagnosed him with Adjustment Disorder with Anxiety. The early intervention specialist found child two to be significantly behind in development of his social and adaptive skills. His behavior was anxious and withdrawn. The specialist believed, however, that time and support in a caring environment, together with gentle parenting, would resolve child two's fears relating to toileting and social interaction.

Child three, whose injuries prompted the daycare workers initially to contact SCF, tested in the normal range for his age, which was then two years, and did not need any early intervention services at that time. He had bonded to his foster parents and did not recognize his father during the single visit between father and the boys.

All the specialists shared the opinion that the three boys were in immediate need of a stable and permanent home. The psychologist stated that the lack of consistency and permanence would leave the boys in "emotional limbo" while they waited to see if their father eventually would be able to assume care for them. If he could not, that fact would

create further trauma at a critical point in the boys' lives. The psychologist's report expressed her concern:

"[Child one] has serious emotional problems already and needs the consistency and permanence of a nurturing home; [child two] is at an age that problems will develop if he is not immediately placed in such an environment. * * * If [father] is unable to succeed at this attempt at parenting and sobriety, * * * [a]t that point have we created another emotionally disturbed child ([child two], possibly [child three]), while treatment for [child one] is only to proceed at a slow rate due to the lack of consistency and permanence?"

In its ruling from the bench, the trial court suggested that it would order termination for father if it could, but the court viewed this court's case law as requiring an opposite ruling. Accordingly, the trial court denied the state's petition to terminate father's parental rights. On appeal, the state urges us to terminate father's parental rights on some of the same grounds alleged in the petition, most particularly, unfitness arising from father's alcohol and substance abuse, his mental condition, and his criminal conduct. *See* ORS 419B.504(1), (3), and (6).

ORS 419B.504 authorizes the termination of parental rights upon a finding of unfitness.[3] The statute sets forth

---

[3] ORS 419B.504 provides:

"The rights of the parent or parents may be terminated as provided in ORS 419B.500 if the court finds that the parent or parents are unfit by reason of conduct or condition seriously detrimental to the child and integration of the child into the home of the parent or parents is improbable within a reasonable time due to conduct or conditions not likely to change. In determining such conduct and conditions, the court shall consider but is not limited to the following:

"(1) Emotional illness, mental illness or mental deficiency of the parent of such nature and duration as to render the parent incapable of providing proper care for the child for extended periods of time.

"(2) Conduct toward any child of an abusive, cruel or sexual nature.

"(3) Addictive or habitual use of intoxicating liquors or controlled substances to the extent that parental ability has been substantially impaired.

"(4) Physical neglect of the child.

"(5) Lack of effort of the parent to adjust the circumstances of the parent, conduct, or conditions to make the return of the child possible or failure of the parent to effect a lasting adjustment after reasonable efforts by available social agencies for such extended duration of time that it appears reasonable that no lasting adjustment can be effected.

"(6) Criminal conduct that impairs the parent's ability to provide adequate care for the child."

a nonexclusive list of conduct or conditions that the court must consider in its analysis of a parent's present fitness. As a predicate, the court must find that a parent is presently unfit by reason of conduct or condition that is seriously detrimental to the child. The court must further find that, due to conduct or conditions unlikely to change, the child's integration into the parent's home is improbable within a reasonable time. That period of time is measured by what is reasonable "given a child's emotional and developmental needs and ability to form and maintain lasting attachments." ORS 419A.004(21). Finally, if the court determines that the statutory grounds are satisfied by clear and convincing evidence, ORS 419B.521(1), the court must further find termination to be in the "best interest of the child." ORS 419B.500.

■   We turn to the evidence as it bears on father's present parental fitness. Father admits that he cannot presently care for his children. He estimates that it would require one to two years of sobriety before he could take full responsibility for them. He hopes to rely on his parents to provide a temporary guardianship until he can get "better established." Father acknowledges that his present inability to care for his children is due to his illegal drug use and his alcohol use, both of which are ongoing and are forbidden under the terms of his parole. Father also acknowledges that, although he has taken a number of classes on substance abuse, parenting, anger management, and relapse prevention, the threat of prison and of losing his children have not previously been enough incentive to keep him from relapsing. A few months after his release from prison, and just six weeks before the termination trial, father relapsed by consuming alcohol and using methamphetamine, which he admitted when confronted by his parole officer. He testified that he had "lost hope" that he would get his children back and that he had made poor choices.

ORS 419B.504 also requires that, in our determination of a parent's fitness, we also consider the children's circumstances—that is, whether conduct and conditions have been "seriously detrimental" to the children. One consequence of father's criminal conduct has been his separation from his children for much of their young lives. He has been completely unavailable to child three for all but five months

of his life. Child two has lived with his father for only 14 months. And only a total of about two years of child one's five years have been spent with his father. Even when father was not in jail or prison, by his own admission, he remained away from the children to continue his drug and alcohol use. As the psychologist testified, no significant parent-child bond appears to exist between father and the children, especially the younger two. The children, especially the older two, clearly have special needs that require consistent, structured parenting, yet father seems not to have grasped the magnitude of their needs, and he has remained unavailable to them as a parent. Thus, the evidence clearly and convincingly demonstrates father's parental unfitness.

Although we find father to be presently unfit, we must also determine whether he might become fit within a reasonable time, in light of the children's needs. ORS 419B.504. As we noted above, both father and SCF's evaluators agree that father would require at least one to two years of sobriety, crime-free conduct, and development of parenting and anger management skills. We find the prospect of father's success in those endeavors to be dubious at best. But, even if he were to be successful, one or two years is not "within a reasonable time" when we consider the pressing needs of the children.

■■ Finally, we must consider whether termination is in the best interest of the children. ORS 419B.500. The team of specialists that evaluated the children made it clear that both child one and child two need more than minimally adequate parenting to overcome their special needs. The older boys' needs are immediate, and all three children need a consistent, stable, and permanent family situation. Impermanent foster care is never in a child's best interest. *State ex rel Juv. Dept. v. Geist*, 310 Or 176, 187, 796 P2d 1193 (1993). These boys are currently living in such a situation, however, and would continue to be in temporary foster care for at least another one or two *years* if father's rights are not terminated. That is too long for these children; father's efforts come too late. We are particularly troubled by father's use of alcohol and methamphetamine just weeks before the termination trial, despite his knowledge that his conduct was at issue and under scrutiny. In fact, father cites his "depression" about the

situation as an excuse for that conduct. If, under those conditions, father still makes such choices, we do not believe that he will make better ones when faced with the challenges of raising three children, especially children with special needs. The immediacy and nature of the children's needs and the uncertainty of father's future convinces us that SCF's petition to terminate father's parental rights should be granted.

In arguing for a contrary result, father adopts the trial court's reasons for denying the termination petition. As we noted above, the court viewed two reported decisions of this court as impediments to termination here because they similarly involved an incarcerated parent. In both cases, we concluded that termination was not warranted. *See State ex rel CSD v. Rollins*, 136 Or App 7, 900 P2d 1072 (1995), *vacated on other grounds* 322 Or 599, 910 P2d 1107 (1996), and *State ex rel SOSCF v. Stillman*, 167 Or App 446, 1 P3d 500, *rev allowed* 331 Or 283 (2000). Believing that it was constrained by our decisions in those cases, the trial court denied the petition.

We view neither *Rollins* nor *Stillman* as compelling denial of the termination petition on this record. *Rollins* involved the parental rights of a mother who had a history of drug addiction and incarceration. The child was born while the mother was incarcerated on drug-related offenses. The mother assumed care of the child on her release from jail. The mother was arrested again a few months later and sentenced to two years' incarceration. After SCF filed a termination petition, the mother volunteered for a "boot camp" program and expected release to transitional housing in six months. *Rollins*, 136 Or App at 9-11. This court reversed the trial court's judgment terminating the mother's parental rights because the state had not shown by clear and convincing evidence that integration of the child into the mother's home was " 'improbable in the foreseeable future due to conduct or conditions unlikely to change.' " *Id.* at 14 (quoting ORS 419B.504 (1995)).

■ Significantly, in 1997, after our decision in *Rollins*, the legislature changed the temporal standard for ORS 419B.504 by amending the reference to integration "in the foreseeable future" to focus instead on integration "within a

reasonable time." The legislature specifically defined what was reasonable in terms of the child's "emotional and developmental needs." ORS 419A.004(21). Those amendments shifted the statute's focus from the parent to the child in the sense that the time frame for integration now is to be measured by the child's needs, not by the parent's potential for reform. Consequently, the trial court's reliance on *Rollins* as dictating a standard that places father's time frame for reform before the children's time frame to have their needs met is misplaced.

*Stillman* likewise is not controlling. In *Stillman*, the father had a long history of drug use; he was eventually convicted on methamphetamine manufacturing charges and sentenced to federal prison. Before entering prison, he voluntarily began an intensive drug treatment program. He suffered a single relapse, but he then sought extra assistance and also voluntarily enrolled in a parenting class. While incarcerated, the father underwent further extensive drug treatment, including a 500-hour program, and initiated and organized a 12-step substance abuse program for other inmates. He also quit smoking on his own, even though smoking is permitted in federal prison, and took parenting and other classes, all to become a better parent for his children. Uniformly, prison instructors praised the father as a "model" student and, because of his good behavior, he worked outside the prison on a forestry work crew. The father maintained a relationship with his children, who were in foster care with relatives, through visits and letters. He did not suffer from any psychological problems other than his drug addiction. Most significantly, the children, who were five and seven at the time of trial, had no special needs and were bonded to their father. *Stillman*, 167 Or App at 449-55.

SCF argued in *Stillman* that the father's incarceration made him presently unfit by reason of conduct or condition that was seriously detrimental to the children. ORS 419B.504 (1997). At the time of the termination trial, the father had been incarcerated for about two years and was scheduled for release to a halfway house in about four months. We held there, as we have consistently before, that "incarceration alone does not warrant a finding of unfitness" and that the relatively short time remaining before the father

could resume parenting did not make him unfit. *Id.* at 457. SCF also presented the father's prior substance abuse as evidence of his unfitness but, noting the considerable progress he had made toward recovery and the confidence expressed by the professionals who had worked with him, we concluded that there was not clear and convincing evidence that the father would relapse. *Id.* at 459. Consequently, on the facts before us in that case, neither the father's incarceration nor the possibility of relapse made him presently unfit as a parent, and we reversed the judgment of termination. *Id.*

■    In this case, father adopts the trial court's rationale, contending on appeal that *Stillman* requires the court, when determining whether father is presently unfit, to evaluate what he has done *since* his release from prison and, because he has been released from prison, not to consider the period of time that father was incarcerated. That reading of *Stillman*, however, is too restrictive. Although a court should consider a parent's efforts since release from incarceration, it cannot evaluate parental fitness in a vacuum by ignoring the path of behavior and circumstances that led to the termination proceeding. ORS 419B.504(6) specifically requires the court to consider a parent's criminal conduct if it impairs the parent's ability to provide adequate care for the child.[4] Surely, criminal conduct that results in incarceration—particularly a recurring pattern of criminal conduct and incarceration—has an effect on a parent's ability to provide parental care. Although *Stillman* provides that incarceration *alone* ordinarily will not support a finding of unfitness, *id.* at 457, incarceration *in addition* to other factors may indeed support such a finding. In deciding fitness, we must consider the entire circumstances. *State ex rel SOSCF v. Frazier*, 152 Or App 568, 598, 955 P2d 272, *rev den* 327 Or 305 (1998).

After considering the entire circumstances in this case, we hold that, for the reasons explained above, the state's petition to terminate father's parental rights should be granted.

---

[4] When the 1997 Legislature amended ORS 419B.504 to reflect the "reasonable time" standard discussed above, it simultaneously added this additional criterion to the nonexclusive list that a court must consider when determining conduct and conditions that are seriously detrimental to a child and which would be unlikely to change. *See* Or Laws 1997, ch 873, § 7, codified at ORS 419B.504(6).

Reversed and remanded for entry of an order terminating father's parental rights.