110 P.3d 580 (2005)
338 Or. 399
In the Matter of Jennifer Jeannette Rardin, a Minor Child.
STATE ex rel DEPARTMENT OF HUMAN SERVICES, Respondent on Review,
v.
Christopher RARDIN, Petitioner on Review.
(CC No. 2590J; CA A125045; SC S51810).
Supreme Court of Oregon, En Banc.
Submitted on the Record February 4, 2005.
Decided April 14, 2005.
James A. Palmer, Eugene, filed the brief for petitioner on review.
Robert M. Atkinson, Assistant Attorney General, Salem, filed the brief for respondent on review. With him on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.
Karen S. Torry, Portland, filed a brief on behalf of Jennifer Rardin, Minor Child.
*581 De MUNIZ, J.
A juvenile court terminated father's parental rights. Father appealed to the Court of Appeals. The Court of Appeals, however, dismissed father's appeal, because that court concluded that the notice of appeal was untimely and that father had failed to raise a colorable claim of error. ORS 419A.200(5)(a) permits a party to file an untimely notice of appeal from a juvenile court judgment if the party (1) demonstrates the existence of a colorable claim of error in the underlying proceeding from which the appeal is taken; and (2) demonstrates that the failure to file a timely notice of appeal was not the party's fault.[1] The issue in this parental termination proceeding is whether father has raised a "colorable claim of error" sufficient to excuse his late-filed notice of appeal. We conclude that father's appeal raises a colorable claim of error, and we therefore reverse the order of the Court of Appeals and remand for further proceedings.
We take the facts from the trial court's letter opinion. In 1995, while father and mother were living together, mother conceived and bore the child that is the subject of this dispute. Father signed the birth certificate, acknowledging his status as the child's father. About six months later, however, mother informed father that child was not his. In October 1995, the Support Enforcement Division required father to pay child support as the legal father. When child was a year and a half old, parents separated. Father made some child support payments after the separation.
Between 1997 and 1999, the Department of Human Services (DHS) could not locate father. When contacted in 1999, father told DHS did not want to participate in child's upbringing and support unless he could be convinced of his paternity through a DNA test. Father could not afford the fee, which was between $1,250 and $2,500, and DHS would not pay for testing. Father and DHS corresponded intermittently from 1999 to 2001.
In April 2002, DHS sent father a letter of expectation[2] stating that, if father worked with DHS, DHS would assist him in developing a relationship with child and that she eventually might be placed with him. By mid-2002, however, DHS became less interested in assisting father and decided to seek the termination of his parental rights. DHS instructed father not to contact child directly but, instead, to send letters, cards, pictures, and presents to her through DHS. He sent *582 items at least once a week. Later, however, DHS informed father that it had stopped giving his cards and letters to child. Father initially did not understand that termination was DHS's goal. However, DHS did advise father that it had decided to seek to terminate his parental rights because the changes that DHS wanted in father's actions had not occurred quickly enough. In August 2002, father paid for paternity testing that confirmed that he was child's biological father.
In October 2002, DHS filed a petition for termination of father's parental rights.[3] The petition alleged, inter alia, that father was
"unfit by reason of conduct or condition seriously detrimental to the child and integration of the child into the father's home is improbable within a reasonable time due to conduct or conditions not likely to change, including, but not limited to the following: a) Failure to present a viable plan for the return of the child to the parent's care and custody [and] b) Abandonment of the child."
After a hearing, the trial court issued a lengthy and detailed letter opinion. The court made the following findings regarding father's current living conditions:
"[Father] now lives in Pomeroy, Washington. He has lived there about five or six years. He has extended family living in that area. [Father] has other children with whom he gets along very well. [He] is engaged to be married to a woman who has a five year old child. [Father] currently lives in a trailer with an addition which has two or three bedrooms. The yard is clean and fenced. Two children live with the family. They have a poodle dog. * * * [Father] is employed as a general contractor. He has also been working as a painter. If [child] were to be allowed to live with [father], she would go to elementary school in Pomeroy, Washington. The school is about eight blocks away and most of the children walk to school. After school, [father] or other extended family members could watch [child]. Those family members provide regular child care for the other children living in his home."
The trial court noted father's desire to have a relationship with child:
"[Father] wants a relationship with [child]. * * * Since the petitions have been filed, [father] has asked to see [child] but has not been allowed to see her. His attempts to write to her have also been limited. * * * DHS['s] only concern about [father] is his lack of a relationship with [child]."
With respect to child having had little contact with father during her life, the trial court noted:
"Treatment providers believe [child's] relationship to [father] is further complicated by the fact that [child] has had other father figures who have been abusive and hurtful. As a result, [child] does not trust men. She is confused by the fact that her father had not met her yet, but writes and says he loves her. She wonders why he now wants to be involved with her. She does not remember him and does not recall ever meeting him. She thinks of him as a stranger."
In addition, the trial court noted the psychologist's observations:
"Dr. Eastman was aware that there were no alcohol or drug issues raised concerning [father]. Dr. Eastman also opined that had visitation started with the father a year ago, that might have been a viable plan. However, according to Dr. Eastman, any biological father should be reintegrated into his child's life not later than the child's third birthday. Had services been provided earlier, [father] might now be reintegrated into [child's] family relationships."
(Footnotes omitted.) The court then explained the circumstances for the lack of contact between father and child:
"[Child] was three years old in 1998. At that time, [father] knew of [child's] circumstances. DHS has contacted with him [sic], but he chose to do nothing to avail himself of services because of his self-imposed DNA test precondition to contact with [child] and acceptance of services. *583 * * * The Court notes that the current reasons [father] has not met [child] is that counselors and DHS have asked him to wait for [child] to become emotionally better prepared for that meeting. The Court further notes that this issue would never have arisen had [father] promptly acknowledged paternity or promptly agreed to participate in reunification service."
On the merits, the trial court concluded that DHS had failed to prove abandonment. The remaining legal issue, according to the trial court, was whether father had presented a "viable plan for the return of the child to the parent's care and custody[.]" The trial court acknowledged that father had a suitable home and family, and a plan for child's schooling. Emphasizing the delays that ensued in the contacts between father and DHS, however, the court concluded that father's "contact came so late that [child] is not psychologically able to accept him as a * * * parent":
"The fact that he now presents a viable place for physical location of [child] is not sufficient. As a result of the delayed contact between [father] and [child], it is not emotionally viable for [child] to be incorporated into [father's] home within a reasonable time. The Court concludes that these facts establish by clear and convincing evidence that [father] has failed to present any viable plan to return [child] to his home, care and custody."
The court continued:
"With regard to [father's] petition, the evidence is uncontradicted that a biological father should be integrated into a child's life not later than the child's third birthday. After the child's third birthday, the child will usually view the absent father as a stranger. At that point, establishing a plan to introduce the father to the child may take substantial time, because the child must be allowed time to admit a stranger into her life and accept him emotionally as the father."
Thus, as the trial court saw it, the only consideration that justified terminating father's parental rights was that father's attempts to establish a relationship with child came too late.
On May 6, 2004, the trial court entered a judgment terminating father's parental rights. Relying on ORS 419B.504, the judgment stated that
"father is unfit by reason of conduct or condition seriously detrimental to the child and integration of the child into the father's home is improbable within a reasonable time due to conduct or conditions not likely to change, including the following: failure to present a viable plan for the return of the child to the parent's care and custody."
The judgment also stated, relying on ORS 419B.506, that
"father has failed and neglected without reasonable and lawful cause to provide for the basic physical and psychological needs of the child for six months prior to the filing of the petition as shown by his: failure to implement a plan designed to lead to the integration of the child into the father's home."
Father wanted to appeal. However, father's court-appointed appellate counsel was not informed that a judgment had been signed and entered. On May 26, 2004, the Tillamook County Juvenile Department (department) informed father's trial attorney that a final judgment had not been signed and that the Department would mail a copy to father's counsel when it was signed. When appellate counsel contacted a trial court staff person about the case, he was told, as late as June 1, 2004, that the court had not yet signed the judgment. On June 4, 2004, when father's trial attorney inquired again about the judgment, he also was told that the judgment had not been signed. On June 9, 2004, the trial court administrator informed father's trial attorney that the court had signed the judgment on May 4, 2004, and that three copies had been sent to the Department of Justice. As of June 14, 2004, neither mother's or father's trial attorneys had been sent a copy of the judgment, either by the trial court or the state.
On June 10, 2004, father's appellate counsel learned that the judgment had been entered on May 6, 2004. By that time, the 30-day deadline for filing a notice of appeal had *584 expired. ORS 419A.200(3)(c). On June 14, 2004, father filed a Motion to Allow Late Filing of Notice of Appeal and a Notice of Appeal. The state filed a response and moved to dismiss the appeal. The state conceded that father had demonstrated that his failure to file a timely notice of appeal was not personally attributable to him and that he had filed his request for delayed appeal within 90 days of entry of the trial court's judgment, as ORS 419A.200(5)(c) requires. Nevertheless, the state moved to dismiss the appeal, arguing that father had not satisfied the "colorable claim of error" requirement set out in ORS 419A.200(5)(a)(A). In response, father filed an affidavit completed by his trial attorney that framed the issues at stake in the trial, including an attempted refutation of the trial court's conclusion that it had been too late for father to present a viable plan for the return of child because too much time had passed.
On August 5, 2004, the Court of Appeals issued an order denying father's motion for delayed appeal and dismissing the case. The Court of Appeals concluded that father had failed to demonstrate a colorable claim of error under ORS 419A.200(5)(a)(A). In doing so, however, the Court of Appeals tested father's arguments against "the trial court's determination that father had abandoned the child." The trial court, however, had made no such determination. In fact, it had reached the opposite conclusion, viz., that the state had failed to prove abandonment. We now evaluate father's claims against the actual grounds upon which the trial court relied to justify termination of father's parental rights.
The legislature has not defined the phrase "colorable claim of error," as that phrase is used in ORS 419A.200(5)(a)(A). Any inquiry into the legislature's intended meaning of that phrase must be undertaken according to the principles set out in PGE v. Bureau of Labor and Industries, 317 Or. 606, 610-12, 859 P.2d 1143 (1993). Pursuant to that methodology, we first examine the text and context of the statute, giving words of common usage "their plain, natural, and ordinary meaning." Id. at 611, 859 P.2d 1143. If the legislature's intent is clear from the text and context of the statute, then further analysis is unnecessary. Id. Statutory context "includes other provisions of the same statute and other related statutes, as well as the preexisting common law and the statutory framework within which the [statute] was enacted[.]" Denton and Denton, 326 Or. 236, 241, 951 P.2d 693 (1998).
Here, the ordinary meaning of the term "colorable" is "seemingly valid and genuine: having an appearance of truth, right, or justice: PLAUSIBLE[.]" Webster's Third New Int'l Dictionary 449 (unabridged ed 2002).[4] Furthermore, as context for defining the term "colorable claim of error," we find helpful some discussion from Waybrant v. Bernstein, 294 Or. 650, 661 P.2d 931 (1983)  a case that issued before the legislature enacted ORS 419A.200(5)(a)(A) and that is procedurally analogous to this one. There, the plaintiff had brought a wrongful death action against the personal representative of a decedent's estate. The plaintiff's action subsequently was dismissed without prejudice. The estate was later closed and the defendant discharged as personal representative. The plaintiff did not appeal the judgment closing the estate, even though it was appealable. Several months later, the plaintiff filed another action against the decedent's estate, but the personal representative moved to dismiss the complaint based on the earlier judgment that had closed the estate. The plaintiff then filed a motion to vacate the earlier judgment closing the estate on the basis that he had not received notice of the judgment. The trial court denied the plaintiff's motion. The plaintiff appealed that denial, but the Court of Appeals ruled that the order in question was not appealable. *585 This court allowed review to address that conclusion. Id. at 656, 661 P.2d 931.
The court began by observing the general rule that, when a court issues an appealable judgment, and the litigants miss the deadline by which to appeal, the litigants will not get a second opportunity for appellate review of the correctness of the judgment if a trial court later denies a motion to vacate the judgment. The court noted, however, that one exception to the rule is that a litigant may obtain appellate review if her or she can show that the appealable judgment is void. The plaintiff in Waybrant had argued in the Court of Appeals that the judgment closing the estate was void as applied to him. This court therefore concluded that it would need to "determine whether the plaintiff ha[d] established a colorable claim" that the judgment was void as to him, thus mandating further analysis by the Court of Appeals. Id. at 656, 661 P.2d 931. The court then analyzed the potential merits of the plaintiff's claim that the judgment was void as pertaining to him in light of his lack of notice. The court concluded that, if the plaintiff could establish that he had been entitled to notice, that he had not received notice, and that his claim otherwise was not barred, then the judgment closing the estate indeed may have been void as applied to the plaintiff. And, if the judgment was void, the trial court's order denying his motion to vacate the judgment would be appealable. Based on that analysis, the court concluded that the plaintiff had established a colorable claim that the judgment closing the estate was void as to him. Id. at 659, 661 P.2d 931.
Taking into account the definition of "colorable" from Webster's dictionary, and the discussion of the term "colorable claim" set out in Waybrant, we conclude that the legislature intended the phrase "colorable claim of error" as used in ORS 419A.200(5)(a)(A) to describe a claim that a party reasonably may assert under current law and that is plausible given the facts and the current law (or a reasonable extension or modification of current law). We now test father's claim against that standard.
In justifying termination of father's parental rights, the trial court initially relied on ORS 419B.504, which provides:
"The rights of the parent * * * may be terminated * * * if the court finds that the parent or parents are unfit by reason of conduct or condition seriously detrimental to the child * * * and integration of the child * * * into the home of the parent * * * is improbable within a reasonable time due to conduct or conditions not likely to change."
This court has construed ORS 419B.504 to impose two separate requirements before a trial court may terminate a parent's rights:
"ORS 419B.504 sets out a two-part test for determining whether to terminate parental rights, both parts of which must be met before the court orders termination. First, the court must address a parent's fitness: The court must find that the parent is `unfit by reason of conduct or condition seriously detrimental to the child.' That, in turn, requires a two-part inquiry: The court must find that: (1) the parent has engaged in some conduct or is characterized by some condition; and (2) the conduct or condition is `seriously detrimental' to the child. Second  and only if the parent has met the foregoing criteria  the court also must find that the `integration of the child into the home of the parent or parents is improbable within a reasonable time due to conduct or conditions not likely to change.' That second part of the test for termination requires the court to evaluate the relative probability that, given particular parental conduct or conditions, the child will become integrated into the parental home `within a reasonable time.'"
State ex rel SOSCF v. Stillman, 333 Or. 135, 145-46, 36 P.3d 490 (2001).
ORS 419B.504 also lists several nonexclusive considerations that a court may use as factors in its decision.[5] In addition, the *586 Court of Appeals has added a consideration to the list, that of whether the parent has failed to present a viable plan for the return of the child to his or her care and custody. State ex rel SOSCF v. Blum, 175 Or.App. 447, 459, 28 P.3d 1231 (2001); State ex rel Juv. Dept. v. Boren, 105 Or.App. 599, 607-08, 806 P.2d 149 (1991).[6]
Here, the trial court relied on that last nonstatutory consideration in such a manner as to encompass both requirements set out in ORS 419B.504. That is, in the trial court's view, father's failure to present a "viable" plan encompassed both (1) the requirement that the parent has engaged in some conduct or is characterized by some condition that is "seriously detrimental" to the child; and (2) the requirement that the "integration of the child into the home of the parent or parents is improbable within a reasonable time due to conduct or conditions not likely to change."
The crux of the trial court's decision to terminate father's parental rights was that it was too late for father to establish a relationship with his child, even though he had demonstrated that he could provide her with a home, education, and family support. After the age of three, according to the trial court, a parent cannot reestablish a relationship with his or her child. The trial court concluded that the parent  here, father, is a "stranger" at that point and that, in this case, child therefore must be moved into to foster care.
As noted earlier, father challenged that conclusion at trial. He argued  and still argues on review  that the actions of DHS had hindered and prevented him from reestablishing a relationship with child earlier.
Father's argument implicitly challenges the trial court's conclusion that a father, or any parent, cannot reestablish a relationship with a child after the age of three. The trial court concluded that it would be preferable to place child with unrelated persons, i.e., foster parents, than to permit father to reestablish a relationship with his biological child. The trial court presented its conclusion as a consideration not only of psychological significance, but as a rule or presumption of far-reaching consequences. We question whether such a conclusion is consistent with the legislative intent expressed in ORS 419B.504. However, as explained further below, we need not decide as much to resolve this case.
Father's argument raises an additional  and, we conclude dispositive  question under ORS 419B.504 and Stillman, namely, whether father is unfit. Stillman explains that, under ORS 419B.504, a trial court must address a parent's fitness before reaching the question of integration into the parent's home. Stillman emphasized that
"the court must address a parent's fitness: The court must find that the parent is `unfit by reason of conduct or condition seriously detrimental to the child.' That, in turn, requires a two-part inquiry: The court must find that: (1) the parent has engaged in some conduct or is characterized by some condition; and (2) the conduct or condition is `seriously detrimental' to the child."
333 Or. at 145, 36 P.3d 490. Contrary to that explanation from Stillman, the trial court appeared in this case to emphasize the issue of integration over the prerequisite issue of fitness.
Father maintained before the trial court  and still maintains  that he is a fit parent, arguing that "the only evidence presented was that father was a good parent to the child in his household, and that the agency *587 had no concerns about his parenting ability." The trial court, however, did not address any issue respecting father's fitness. Instead, the court rejected the "viability" of father's "plan," terms unfamiliar to the text of ORS 419B.504. The court's emphasis on the question of viability turned solely on father's lack of a relationship with child and, ultimately, the court's conclusion that father could not reestablish a relationship after child had turned three. Based on the foregoing, we conclude that father has raised a "colorable claim of error," viz., whether the trial court adhered to ORS 419B.504 and this court's cases in terminating father's parental rights.
The judgment terminating father's parental rights also referred to the standard set out in ORS 419B.506. Under ORS 419B.506, a parent's rights may be terminated if the court finds that the parent has "failed or neglected without reasonable and lawful cause to provide for the basic physical and psychological needs of the child * * * for six months prior to the filing of a petition." It is undisputed that DHS limited father's contact with child between April 2002 and the filing of the petition in October 2002. Father argues that DHS prevented him from establishing a relationship with child during that period by, for example, forbidding him from having contact with child. Father's argument may establish a plausible defense to parental termination under ORS 419B.506. We therefore conclude that father's argument is "colorable" on that ground, as well.
For the foregoing reasons, we conclude that the Court of Appeals erred in denying father's motion to file an untimely notice of appeal under ORS 419A.200 and in dismissing the appeal.
The decision of the Court of Appeals is reversed and the matter is remanded to the Court of Appeals for further proceedings.
NOTES
[1] ORS 419A.200(5)(a) provides:

"Upon motion of a person, other than the state, entitled to appeal under subsection (1) of this section, the appellate court shall grant the person leave to file a notice of appeal after the time limits described in subsection (3) of this section if:
"(A) The person shows a colorable claim of error in the proceeding from which the appeal is taken; and
"(B) The person shows that the failure to file a timely notice of appeal is not personally attributable to the person."
[2] A "letter of expectation" is "a written statement developed by [DHS] that identifies needs and services and clarifies agency expectations and timelines, without the joint participation or agreement of the parents." OAR XXX-XXX-XXXX(6).
[3] The petition bears a file stamp of October 14, 2002. We are unable to determine why the letter opinion states that the petition was filed in May 2002.
[4] We note that the legislature also has employed the term colorable in other contexts involving legal advocacy. See, e.g., ORS 138.071(4)(a)(B) (criminal-appeal analog to ORS 419A.200); ORS 138.222(7) ("defendant may appeal under this subsection only upon showing a colorable claim of error * * * "); ORS 197.845(1) ("Upon application of the petitioner, the board may grant a stay of a land use decision or limited land use decision under review if the petitioner demonstrates: (a) A colorable claim of error in the land use decision or limited land use decision under review; and (b) That the petitioner will suffer irreparable injury if the stay is not granted.").
[5] Those statutory considerations under ORS 419B.504 are:

"(1) Emotional illness, mental illness or mental deficiency of the parent of such nature and duration as to render the parent incapable of providing proper care for the child or ward for extended periods of time.
"(2) Conduct toward any child of an abusive, cruel or sexual nature.
"(3) Addictive or habitual use of intoxicating liquors or controlled substances to the extent that parental ability has been substantially impaired.
"(4) Physical neglect of the child or ward.
"(5) Lack of effort of the parent to adjust the circumstances of the parent, conduct, or conditions to make it possible for the child or ward to safely return home within a reasonable time or failure of the parent to effect a lasting adjustment after reasonable efforts by available social agencies for such extended duration of time that it appears reasonable that no lasting adjustment can be effected.
"(6) Criminal conduct that impairs the parent's ability to provide adequate care for the child or ward."
[6] This case presents no issue respecting the propriety of that additional, nonstatutory criterion, and we express no opinion in that regard.