Submitted on remand from the Oregon Supreme Court May 5, argued on remand
August 25, affirmed November 16, 2005; petition for review allowed
January 31, 2006 (340 Or 106)

In the Matter of
Jennifer J. Rardin, a Minor Child.

STATE ex rel DEPARTMENT OF HUMAN SERVICES,
*Respondent,*

*v.*

Christopher RARDIN,
*Appellant.*

2590J; A125045

123 P3d 362

James A. Palmer argued the cause and filed the brief for appellant.

Laura S. Anderson, Assistant Attorney General, argued the cause for respondent. With her on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Before Wollheim, Presiding Judge, and Brewer, Chief Judge, and Leggert, Judge pro tempore.

WOLLHEIM, P. J.

## WOLLHEIM, P. J.

Father appeals from a judgment terminating his parental rights to his seven-year-old daughter, J.[1] Father assigns error to the trial court's conclusions that his parental rights should be terminated due to unfitness, ORS 419B.504, and neglect, ORS 419B.506. We review *de novo*, ORS 419A.200(6)(b), and conclude that the state has proved by clear and convincing evidence that father's parental rights should be terminated due to unfitness. Because of that conclusion, we need not address whether father's parental rights should also have been terminated on the basis of neglect. Accordingly, we affirm.

J was born in January 1995, and father, although not married to mother, signed the birth certificate acknowledging paternity. During the time father and mother were together, father actively participated in parenting J. Father and mother separated in 1996, when J was about one and one-half years old. Mother obtained a judgment against father for child support in the amount of $120 a month. After they separated, mother told father that J was not his child. Father made a few support payments here and there, but at the time of the termination trial, father was in arrears for almost $7,000.

Less than a year after the separation, in September 1997, DHS removed J from mother's home due to the living conditions there. DHS attempted to locate father, but was unsuccessful. Father had not had any contact with mother or J since mother and father separated. From the September 1997 incident up to the time of the state's petition for termination, mother's actions required DHS to intervene and take custody of J on multiple occasions.

Father contacted DHS in 1999 after receiving a letter of expectation and a notice of administrative review from

---

[1] We originally dismissed father's appeal because we determined that it was untimely and that he failed to raise a colorable claim of error. Father petitioned the Supreme Court for review of that decision. The Supreme Court granted review, and reversed our decision, concluding that father had in fact raised a colorable claim of error. *State ex rel Dept. of Human Services v. Rardin*, 338 Or 399, 110 P3d 580 (2005).

DHS. In the letter of expectation, DHS informed father that it was willing to provide father with services and work toward a relationship with J, but father refused. Based on mother's assertions, father did not believe that he was J's father, and, until a paternity test proved that he was J's father, father was unwilling to assume any responsibility for J. Father explained that he could not afford the paternity test on his own and suggested that DHS pay for the testing. In January 2000, DHS sent father another letter informing him that he was the "recognized legal father" of J and requesting that father contact DHS "to discuss [father's] intent [in order to] determine how to proceed." A DHS letter sent in December 2001 contained the same information. Father's position on the matter remained the same. The last letter DHS sent to father was an April 15, 2002, letter of expectation explaining that he was the legal father of J, offering services, and explaining that failure to contact DHS could possibly result in a petition for termination of father's parental rights. The letter of expectation gave father a May 10, 2002, deadline to respond.

On May 3, 2002, on the state's petition, the trial court relieved DHS of further efforts to reunify J with mother or father. After the May 10, 2002, deadline for father's response set out in the last letter of expectation, father responded and informed DHS that he had undergone a DNA test to determine paternity, and that *if* he was J's biological father, he would be willing to engage in services. Later that month, father received the results of the paternity test indicating that he was in fact J's biological father, and he informed DHS of that fact. However, DHS told father that he was to have no contact with J except through sending letters and presents through DHS. DHS had initially given father's letters to J, but informed father that it had stopped giving J his letters because of J's adverse reaction to the letters. In October 2002, when J was seven years old, the state filed a petition to terminate father's parental rights.[2]

---

[2] The state's petition to terminate mother's parental rights was consolidated into the same proceeding. However, the termination of mother's parental rights is not at issue in this appeal.

In the state's petition for termination, it alleged that, pursuant to ORS 419B.504, father was unfit and that integration of the child into father's home within a reasonable time was improbable due to a "[f]ailure to present a viable plan for the return of the child to the parent's care and custody" and "[a]bandonment of [the] [c]hild." In addition, the state alleged that, pursuant to ORS 419B.506, father's parental rights should be terminated because he neglected to "provide for the basic physical and psychological needs of the child for six months prior to the filing of the petition[.]" The state further alleged, pursuant to ORS 419B.508, that father's parental rights should be terminated due to abandonment.

After trial, the trial court concluded that father's parental rights should be terminated for unfitness and neglect and that termination was in the child's best interests.[3] The trial court based its conclusions primarily on father's lack of a "viable plan for the return of the child to the parent's care and custody[,]" due to father's absence from J's life for such a long period of time. Because it would be too difficult for J to accept father as a parent this late in her childhood, the trial court reasoned, reunification did not present a viable plan. Father appeals.

In reviewing the trial court's conclusions, we must determine on *de novo* review whether the state has proved by clear and convincing evidence that father's parental rights should be terminated due to unfitness or neglect and that termination would be in J's best interests. We begin with the state's allegation that father's parental rights should be terminated due to unfitness.

ORS 419B.504, which establishes when parental rights should be terminated due to unfitness, provides:

"The rights of the parent or parents may be terminated as provided in ORS 419B.500 if the court finds that the parent or parents are unfit by reason of conduct or condition seriously detrimental to the child or ward and integration of the

---

[3] The trial court expressly held that the state failed to prove abandonment. The state does not cross-assign error from that holding. Accordingly, it is not an issue in this case.

child or ward into the home of the parent or parents is improbable within a reasonable time due to conduct or conditions not likely to change."

That statute also lists six criteria that a court may consider in making its decision.[4] However, that list is not exclusive. *State ex rel SOSCF v. Blum,* 175 Or App 447, 454, 28 P3d 1231 (2001), *rev den,* 333 Or 399 (2002). In this case, the trial court relied on a nonstatutory factor, whether father failed to present a viable plan for the return of J to father's care and custody. *See, e.g., id.* at 459 (utilizing that criterion in a termination proceeding).

■  ORS 419B.504 sets out a two-part test that we follow in determining whether to terminate parental rights based on unfitness. *State v. Stillman,* 333 Or 135, 145, 36 P3d 490 (2001). In *Stillman,* the Supreme Court described the test:

"First, the court must address a parent's fitness: The court must find that the parent is 'unfit by reason of conduct or condition seriously detrimental to the child.' That, in turn, requires a two-part inquiry: The court must find that: (1) the parent has engaged in some conduct or is characterized by some condition; and (2) the conduct or condition is 'seriously detrimental' to the child. Second—and only if the parent has met the foregoing criteria—the court also must find that the 'integration of the child into the home of the parent or parents is improbable within a reasonable time due to conduct or conditions not likely to change.' That second part of the test for termination requires the court to

---

[4] The six listed statutory criteria include:

"(1) Emotional illness, mental illness or mental deficiency of the parent of such nature and duration as to render the parent incapable of providing proper care for the child or ward for extended periods of time.

"(2) Conduct toward any child of an abusive, cruel or sexual nature.

"(3) Addictive or habitual use of intoxicating liquors or controlled substances to the extent that parental ability has been substantially impaired.

"(4) Physical neglect of the child or ward.

"(5) Lack of effort of the parent to adjust the circumstances of the parent, conduct or conditions to make it possible for the child or ward to safely return home within a reasonable time or failure of the parent to effect a lasting adjustment after reasonable efforts by available social agencies for such extended duration of time that it appears reasonable that no lasting adjustment can be effected.

"(6) Criminal conduct that impairs the parent's ability to provide adequate care for the child or ward."

evaluate the relative probability that, given particular parental conduct or conditions, the child will become integrated into the parental home 'within a reasonable time.' "

*Id.* at 145-46.

We begin by addressing father's fitness. Father argues that no evidence was presented at trial indicating that he was unfit or would not be an adequate resource for J. The state responds that father's conduct of refusing contact with J for six years constitutes unfitness, and that that conduct was seriously detrimental to J. We agree with the state.

The conduct of father at issue is his voluntary absence from J's life from 1996 until after the DNA test results in 2002. We conclude that that conduct had a seriously detrimental effect on J. First, despite father's early relationship with J, father's absence from J's life for six years has prevented the formation of any renewed relationship or bond between them. *See State ex rel SOSCF v. Freeman*, 174 Or App 194, 202-03, 23 P3d 1009, *rev den*, 332 Or 430 (2001) (relying on the absence of the father from his children's lives and the resultant lack of a parent-child bond in concluding that father was unfit). Dr. Margaret Eastman conducted a psychological evaluation of J and testified that,

"[J]'s confused as to why her father has virtually been a stranger to her and then is writing her letters saying he loves her even though he hasn't met her. She feels insecure and threatened by these promises of love because she's feeling in the past he didn't choose to be part of her life, and she doesn't know him and is wondering why he would want to at this point."

Second, father's conduct allowed J to languish in an unsafe and unstable environment with mother for years. It is unclear whether father knew of DHS's removal of J from mother's custody in 1997. However, it is beyond dispute that father knew of J's situation by 1999, when he responded to DHS's letters. However, father did nothing to help J, despite being her father. Instead, father refused involvement for three years, until the DNA test result confirmed reality: J was father's child.

There is nothing in the record that mitigates the foregoing evidence. Father relies only on the absence of evidence that he has any problem with alcohol or drugs, has any kind of mental disease or defect, has ever abused a child, or has any criminal record, and asserts that he is currently able to provide a good home for J. However, although father may finally be ready, willing, and able to be a father to J, father's current desire does not overcome his past indifference to J's welfare and the seriously detrimental effect it has had on J's development. The state proved by clear and convincing evidence that father is unfit.

We next turn to the second part of our inquiry under ORS 419B.504, whether integration of J into father's home within a reasonable time is possible. ORS 419A.004(20) defines a "reasonable time" as "a period of time that is reasonable given a child or ward's emotional and developmental needs and ability to form and maintain lasting attachments." That is a child-specific inquiry requiring us to look at "testimony in psychological and developmental terms regarding the particular child's requirements." *Stillman*, 333 Or at 146.

As previously discussed, Eastman conducted a psychological evaluation of J and testified that J regards father as a stranger and is confused by his attempts at establishing a relationship with her at this late stage in her childhood. Eastman also testified that J has had "different father figures and many losses of men in her life who have been abusive or hurtful, and she's just starting at a very low trust level with men" and that "she didn't appear ready to be able to go through the anxiety of possibly developing another relationship that may or may not work for her." But we find even more compelling, as did the trial court, Eastman's testimony that "reintegrating father into her life, the stable period for that would have been before the age of three for her to be able to have a security base and trust with him."

Father presented no evidence to the contrary. Instead, father argues that, had DHS worked with father to establish a relationship with J, then reintegration could have

been achieved within a reasonable time. There is limited support in the record for father's position.[5] DHS had already been relieved of further efforts to reunify father with J at that point. In addition, DHS did nothing to limit father from establishing a relationship with J prior to 2002. To the contrary, DHS repeatedly tried to involve father in J's life, to no avail. Father cannot now argue that DHS denied him the opportunity to have a relationship with J. The fault in that situation is attributable to father and father alone. Accordingly, we conclude that there is clear and convincing evidence that, due to J's psychological needs, integration of J into father's home within a reasonable time would not be feasible.

Having concluded that father meets the criteria for termination of his parental rights due to unfitness pursuant to ORS 419B.504, we next must decide whether termination of father's parental rights would be in the best interests of J. ORS 419B.500. Eastman testified that J has "a strong psychological attachment to her foster parents. She is undergoing significant anxiety about her birth parents and doesn't have security or trust that they could meet her needs." Eastman also testified to the possible effects that removal of J from her foster home would cause:

> "To leave her foster home where she has psychological parents would cause a great deal of anxiety and emotional distress and regression, and it would be likely that she would return to have problems that she's had of food hoarding, anger and temper outbursts, anxiety regression, and that she would not have secure return to her parents, not have a trusting security base from which to resolve those issues. So she would be at risk for depression and anxiety and behavioral acting out and possible abuse and neglect and abandonment depending on her parents' ability to react to those issues and meet her needs."

Ultimately, Eastman recommended that J's "permanency be resolved by the Court and that she have time to settle into what the decision would be and be stable with that before her

---

[5] When asked by father's counsel whether there could have been a viable plan had visitation been started in May 2002 when father obtained a DNA test, Eastman replied, "Probably."

father would be introduced as a possible visiting resource for her."

The evidence is clear and convincing. At this late stage in J's childhood, J needs a stable environment that she can depend on. It is in J's best interests that father's parental rights be terminated so that J can finally have the stability and support she requires. Reintegration of J into father's home is not feasible at this late stage in J's childhood. If father wanted a relationship with J, he should have acted sooner when J needed him the most, not now when J finally has a stable family environment. Accordingly, we conclude that the state has shown by clear and convincing evidence that father's parental rights should be terminated due to unfitness because of his failure to present a viable plan for custody of J, and that it is in J's best interests to terminate father's parental rights.

Because we conclude that the state has met its burden for termination of father's parental rights under ORS 419B.504, we need not address whether the state also proved termination due to neglect under ORS 419B.506.

Affirmed.